WILLIAM B. HOLDSWORTH, as Master, etc., Appellant, *v.* P. A. DE BELAUNZARAN et al., Respondents.

Defendants chartered a vessel for a voyage from New York to Cadiz; they to pay to plaintiff a sum specified on delivery of the cargo at Cadiz, "in cash, without credit, discount or commission." Plaintiff performed the obligations of the charter party on his part. Defendants' agent at Cadiz, who had funds in his hands to pay the freight, having been advised by plaintiff that he desired to remit a portion of the same stipulated to his principal, agreed to purchase and remit a bill of exchange for the amount, and thereafter represented that he had so done, and defendants, relying upon such statement on payment of the balance, settled with the said agent, who had not, in fact, made the remittance as agreed, but instead thereof had drawn and transmitted his own draft on defendants, payable sixty days after sight for the amount, which draft defendants refused to accept or pay. Said agent had no authority to draw on defendants and had no funds in their hands. Plaintiff did not know that such draft was drawn until after he left the port of Cadiz and never agreed to accept it, but supposed the remittance was made as agreed. In an action to recover the amount of freight unpaid *held*, that defendant was entitled to judgment; that although plaintiff assented to a mode of payment different from that stated in the charter party, yet as the condition upon which the assent was given was not performed, it did not constitute in any sense a payment of defendants' debt.

*It seems* that if plaintiff had accepted the personal draft of the agent, or had extended to them a credit for the sum, in satisfaction of defendants' obligation, it would have operated as a discharge.

*Holdsworth* v. *De Belaunzaran* (34 Hun, 382) reversed.

(Argued May 9, 1887; decided June 7, 1887.)

APPEAL from order of the General Term of the Supreme Court in the first judicial department, made October 6, 1884, which reversed a judgment in favor of plaintiff entered upon the report of a referee. (Reported below, 34 Hun, 382.)

The nature of the action and the material facts are stated in the opinion.

*Joseph A Shoudy* for appellant. The debtor's own promise, even though it be in the form of another obligation, does not extinguish his indebtedness, unless it is expressly so agreed. (*B'd of Education* v. *Fonda*, 77 N. Y. 350, 362.) When a creditor agrees to accept what is the equivalent of gold coin in lieu of the coin itself, he may not, by false and fraudulent pretenses, be compelled to put up with something that is perfectly worthless, which he never agreed to accept. (*Sandford* v. *Handy*, 23 Wend. 260, 266; *Bennett* v. *Judson*, 21 N. Y. 238; *Hathaway* v. *Johnson*, 55 id. 96; *Lee* v. *Village of Sandy Hill*, 40 id. 442–448; *Krumm* v. *Beach*, 96 id. 398; *Craig* v. *Ward*, 3 Keyes, 387; *Sharp* v. *Mayor, etc.*, 40 Barb. 271; Story on Agency, § 452.) The fraudulent acts of Poggio were within the scope of his authority, and were, therefore, binding upon the defendants. (*Sandford* v. *Handy*, 23 Wend. 265, 266; *Mott* v. *Consumers Ice Co.*, 73 N. Y. 543; *Lee* v. *Village of Sandy Hill*, 40 id. 448.) This cannot be considered a case where the vessel voluntarily received something other than money, and thereby waived payment of the money, for the reason that the master never did receive anything that he had agreed to accept. (*Shepard* v. *De Bernales*, 13 East. 565; Abbott on Ship. 276; *Tapley* v. *Martens*, 8 T. R. 451; *Christy* v. *Rowe*, 1 Taunt. 300.)

*G. L. Rives* for respondents. Where payment is stipulated to be made at a particular place and in a particular

manner, and the debtor puts the requisite funds in the hands of his agent at that place, if the creditor chooses not to receive payment in the manner stipulated he does so at his own risk. (*Darnall* v. *Morehouse*, 45 N. Y. 64; *People ex rel.* v. *Cromwell*, 102 id. 477; *Strong* v. *Hart*, 6 B. & C. 160; Abbott on Ship. 414, 420; Maclachlan on Ship. and Adm. 305; 1 Maude & Pollock's Merch. Ship. 378.) The plaintiff has been guilty of laches in not presenting his draft for acceptance at the proper time, and in not making any effort whatever to collect of the drawer. (Pars. on Ship. and Adm. 305; *Grant* v. *Wood*, 1 Zabris. [21 N. J. L.] 292; *Smith* v. *Miller*, 52 N. Y. 545; *First Nat. B'k* v. *Fourth Nat. B'k*, 24 Hun, 241; *Everett* v. *Collins*, 2 Camp. 515; *Drake* v. *Mitchell*, 3 East, 259; *Shepard* v. *De Bernales*, 13 id. 565, 570; *Anderson* v. *Hillies*, 12 C. B. 499; *Wyatt* v. *Marquis of Hartf.*, 3 East, 147; *Marsh* v. *Pedder*, 4 Camp. 257; *Robinson* v. *Read*, 9 B. & C. 449; *The Salem's Cargo*, 1 Sprague's Dec. 389; *People* v. *Cromwell*, 102 N. Y. 477.)

Ruger, Ch. J. In November, 1881, the defendants chartered the British bark "Bessie" for a voyage from New York to Gibralter and Cadiz, and for its return to New York or some other port in the United States to be named by the charterers at Cadiz. The charter party provided that the defendants should pay the plaintiff £1,100 for the round trip, of which sum £620 were made due and payable, upon proper delivery of the cargo at Cadiz, "in Spanish gold coin at the rate of $4.80 to the pound sterling." "All payments to be made in cash, without credit, discount or commission." Other portions of the stipulated sum of £1,100 were made payable at Gibralter and the home port; but no question arises in the case over the performance by the defendants, in that respect, of their contract obligations.

The defendants loaded the bark at the port of New York with a general cargo, consigned to various persons at Gibralter and Cadiz, under bills of lading in the usual form, specifying the amount of freight payable by the consignees on each

parcel of goods. The full performance by the plaintiff, of the obligations of the charter party, is admitted by the defendants, and their liability for the payment of the full amount stipulated, according to the provisions of the charter party, follows as the necessary consequence of this performance by the plaintiff.

The only question in the case is, therefore, whether the defendants have performed their obligation by causing payment of the sum of £620 to the plaintiff at Cadiz, according to the terms of the charter party.

Before leaving New York, the defendants handed to the plaintiff a letter of instruction by which he was directed to proceed directly to Gibralter, consigning himself to one Gomez, and after discharging the consignments at that place to proceed to Cadiz, consigning himself to Poggio Hermanos, who, it was stated, had full instructions to serve the master in any matter concerning his vessel. It was shown by the evidence that Poggio Hermanos paid to the plaintiff at Cadiz the sum of $528.40 of the sum of £620, leaving apparently unpaid thereon £509, 18s. and 4d., or $2,447.60 · and this is the sum in dispute in this action.

As to the transaction at Cadiz between the plaintiff and Poggio, the referee found as follows: "That while discharging the cargo of said vessel at the port of Cadiz, the said Salvador Poggio inquired of the plaintiff whether he wished to remit any portion of his charter money to his principals, and the master replied that he did wish to remit to his principals through the firm of Baring Brothers of London; that thereupon the said Poggio said to the plaintiff that he would purchase a bill of exchange and remit the same to the said firm of Baring Brothers, and a few days thereafter, when the cargo was about half unloaded, he represented to the plaintiff that he had purchased a bill for £509, 18s. 4d. at 47d. to the dollar, and had remitted the same to Baring Brothers for the account of the master and agent of the said vessel; that said master believed the said statement and representation of said Poggio and relied thereon, and had the accounting

hereinafter referred to, and settled with the said Poggio upon the faith of said representation being true ; that the statement and representation of the said Poggio that he had made such remittance to Baring Brothers was false and untrue, but, on the contrary, the said Poggio, on or about the 16th day of February, 1882, drew his draft in the firm name of Poggio Hermanos upon the defendants by their firm name for the sum of £509, 18s. 4d., \* \* \* payable at sixty days after sight to the order of Baring Brothers, and transmitted the same to Baring Brothers; that Baring Brothers received the same and presented it to the defendants on or about the 1st day of March, 1882, for acceptance, and thereafter, when the same became due, presented it for payment, and the said bill was neither accepted nor paid, but was protested for non-payment, and has never been paid." That the firm of Poggio Hermanos had no funds with the defendants, and had no authority to draw upon them. " That the master of said vessel received no more than $2,833.40 on account of said charter party, leaving a balance of $2,447.60, which was due and payable at Cadiz aforesaid, according to the terms of the charter party. No part of this sum has been paid." That " *the plaintiff never agreed to receive the said draft in pay·ment thereof*, and did not know that the same had been drawn until long after he left the port of Cadiz, but supposed that a remittance had been made as agreed by the said agent."

Shortly before leaving Cadiz the master applied to Poggio for a final settlement of the money payable to him at that place, and Poggio rendered an account in which he charged the master with the sum of £509, 18s. 4d., sent to Baring Brothers February 14, 1882, and various other items of account, together with a sum paid in cash February 28, 1882, sufficient to make up the whole amount of £620. The plaintiff first learned of the mode of remittance attempted by Poggio when he was at Gloucester, after his voyage was completed, and never at Cadiz or elsewhere approved of or accepted the method of remittance adopted by Poggio.

We have also carefully read the evidence upon which the

findings were based, and are of the opinion that they were quite as favorable to the defendants, as the proof would warrant.    Upon these facts the referee made a report in favor of the plaintiff, upon which judgment was entered.    The General Term, upon appeal to that court, reversed the judgment and ordered a new trial.    From that order the plaintiff appealed to this court upon the usual stipulation for judgment absolute in case of affirmance here.

The ground upon which the defense to the action was based is stated in the answer to be as follows : " The said firm of Poggio Brothers *offered to give the plaintiff, instead of cash, their draft or bill of exchange* for the said last mentioned amount ($2,447.60), *to which the plaintiff assented and requested the said Poggio Brothers to draw the said bill of exchange* to the order of Baring Brothers & Co., of London ; * * * that the plaintiff *accepted the said draft voluntarily* and for his own convenience, and did not insist upon payment in cash of the said balance of $2,447.60."

It is quite unnecessary to discuss the question of the validity of such a defense, if it had been established by proof, because in all of its material allegations it was in direct conflict with the findings of the referee, and the fair and reasonable deductions to be made therefrom.    The General Term, however, seems to have become impressed with the idea, notwithstanding the express findings of the referee, and the uncontradicted testimony of the plaintiff, that the personal draft of the Poggios, payable sixty days after sight by the defendants, in New York, had in some manner been accepted by the plaintiff, in satisfaction of the sum payable by the terms of the charter party at Cadiz.

The discussion of the case in the courts below has elicited not only an able opinion from the referee, but also one from each of the judges of the General Term of the Supreme Court, in which a radical difference of views as to the merits of the case has been shown to exist, two of the judges favoring a reversal of the judgment for the plaintiff, ordered by

the referee, and one favoring an affirmance. The theory upon which the majority of that court proceeded will best be presented by brief extracts from their respective opinions. Judge Brady says: "According to the charter party, payment was to be made at Cadiz by the agent of the defendants, and that the draft *which was taken by the plaintiff in lieu of money was drawn at his request*, that he might make remittances, and, of course, without the knowledge of the defendants; and it is to be further noted that the plaintiff, relying upon the statement of the agent that the bill was drawn upon Baring Brothers, *made no personal inspection of it*, and thus enabled the defendant's agent to practice what appears to have been a fraud." Judge Davis, also writing for reversal, says: "The freight, to an amount exceeding the sum due to the plaintiff, was collected by Poggio Brothers, and was known to the plaintiffs to be in their hands. * * * *The plaintiff had only to demand and receive them.* He did receive a portion of them, but the residue he desired, for his own purposes, to remit to Baring Brothers as 'soon as possible.' The defendants were under no obligation to do that for him, and Poggio Brothesr were not their agents to make such remission. * * * *The act of leaving the money due him* in the hands of Poggio Brothers to purchase such draft was solely that of the plaintiff."

We think the conclusions were not warranted by the findings of the referee, and as the reversal must be deemed by us to have been based altogether upon questions of law and not upon the facts, we conclude that the order of reversal was erroneous. The argument of the learned judges writing for reversal ignores the referee's finding that the plaintiff never agreed to accept the draft of Poggio and seems to us to have proceeded upon a misapprehension of the facts of the case, and the nature of the relations existing between the defendants and Poggio Hermanos. It should be borne in mind that the Poggios were, for all purposes, connected with the vessel and its cargo, the agents of the defendants, and, as is now claimed by the defendants, were also agents to make payment to the

plaintiff of the sum due him upon the charter party at Cadiz. The provision of the charter party, for partial payment at Cadiz, was for the benefit of the plaintiff and he could waive performance of that stipulation, or any of its conditions, without injury to the defendants. Thus he could receive payment in other funds than Spanish gold coin, or could allow discount or commission, or extend credit to the agent without prejudicing the interests of the defendants.

If, however, he dealt with the agent and accepted payment in any other form than that provided by the charter party, he would act on his own responsibility and would thereby take the risk of any loss arising out of any change in the mode of performing the contract. By the performance of the stipulations of the charter party by the plaintiff, the defendants became indebted to him in the full sum of the compensation earned by the vessel. They then rested under an active obligation to make this payment, and could be relieved from it only by showing payment or a readiness and ability to pay by themselves, or their agents at the time and place of performance. By consigning the vessel and cargo to Poggio Hermanos with authority to collect the freight payable at Cadiz, they had, indeed, placed their agents in funds to meet their obligations, but it was also their duty to see that the agent performed them. The charter money was not payable to the plaintiff until after delivery of the cargo, and he had no control over the collections for freight made by Poggio, or the defendant's funds in their hands. Although the defendants consigned the bark and its cargo to the Poggios, and authorized them to collect the freight payable by its different consignees at that place, there is no express language either in the charter party or the defendant's letter of instructions to plaintiff, making them his agents to pay the plaintiff, or requiring him to call upon Poggio Hermanos or any other person for the amount due him at Cadiz, or directing him to make demand of that sum of any person. If there was any duty resting upon the plaintiff to make demand from any one, it arises from the fact that Poggio Hermanos, were the defendants' agents and consignees

at Cadiz, and the usual course of trade pointed to them as the persons through whom the defendants had elected to perform their obligation of making payment at that place. The plaintiff had no lien upon the cargo for his charter money, and no means of compelling payment of the amount due him at Cadiz, for it was payable only after delivery of the cargo, and in the natural course of things there would be no one in funds to make payment, until the defendant's agents had collected freight, from the various consignees of the cargo. This could take place only by the delivery of the cargo, from time to time, to its consignees and the collection of the freight money due thereon by defendants' agents. The plaintiff had no control over the collection of this freight, or the defendants' money in the hands of Poggio Hermanos. He had no other means of obtaining money of the Poggios except by asking for it, and when he had done this, and had been refused, or his request had been ignored or evaded, he had done all that was required of him to fix the defendants' liability. The defendants' contract was that the agents at Cadiz would pay the plaintiff £620. The plaintiff frequently made application for payment of the charter money to the Poggios, and when he asked for a final settlement the agents' reply was substantially an allegation that they had already paid such moneys to the plaintiff's principals. It is true that the plaintiff might have denied this statement or still insisted upon receiving his freight money, but there is no reason to suppose that the Poggios would have retracted their statement or have repaid money which they falsely, but yet deliberately, asserted they had already paid. It would have been quite ungracious in the plaintiff to have disputed the assertion of the agents to whose kind offices the defendants had commended him, and it would have been quite ineffectual if he had done so. He had no power to make them pay money, payment of which they had avoided by falsehood, and no means, except persuasion, to induce them to fulfill the obligations they owed to the defendants.

It was impossible for plaintiff then to determine whether

Poggio's statement was true or not. He never had an opportunity to inspect the bill said to have been remitted, or to elect between the reception of the gold coin by himself, or the remittance of the bill. The allegation, that they had remitted was the excuse given by the defendants' agents for not making payment according to the terms of the charter party, and, therefore, he had no alternative except to rely upon it, and in case it proved untrue to look to his charter party for indemnity.

The plaintiff had no legal, enforceable demand or claim against Poggios, and to require him now to accept them as his debtors, and to prosecute the Poggios' upon their draft, would make a contract for him to which he has never assented, The defendants' contract was to pay the plaintiff at Cadiz £620, and when the plaintiff has shown that he afforded the defendants' agents at that place an opportunity to make such payment and they declined to do so, it constitutes a breach of the contract by the defendants, rendering them liable for the sum unpaid.

The case is simply that the defendants' agents, converted the money entrusted to them by their principal, to their own use — and when called upon to discharge their principals' obligation, falsely alleged that they had applied it to that purpose. The plaintiff had no power to prevent the fraudulent conversion of the money by the agents, or to compel its lawful application. All that he did was to acquiesce in its remittance to the ship's owners after it was claimed that it had been made, and if it had actually been remitted it would have discharged the charterer's debt. The plaintiff simply assented to a mode of payment which was not pursued, and the condition upon which this assent was given, was never performed. This did not constitute, in any sense, a payment of the principals' debt.

It cannot be disputed that, if the plaintiff had, at Cadiz, accepted the personal draft of the Poggios' for the amount due to him, or had extended a credit to them for such sum in satisfaction of the defendants' obligation, it would have

operated as a discharge to the defendants, but it is indisputable that the plaintiff never did so, and in fact never knew the mode of the pretended payment until after such knowledge was of no benefit to him.

The legal principles applicable to this case are so elementary and familiar that it needs no citation to illustrate them. In truth the main cause of difference in this case arises over the different views of the fact taken by the learned judges writing in the court below, and not over any question of law.

The order of the General Term should be reversed, and the judgment entered on the report of the referee affirmed.

All concur, except EARL and PECKHAM, JJ., dissenting.

Order reversed, and judgment affirmed.